AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Rhode Island

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>13, 25, and 31 Conduit Street<br>Central Falls, Rhode Island | )<br>)<br>)<br>)<br>)<br>) |

Case No.   1: 12 MJ 336 A

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

13, 25, and 31 Conduit Street in Central Falls, Rhode Island, as described more fully in Attachment A.

located in the _____ District of _____ Rhode Island _____ , there is now concealed *(identify the person or describe the property to be seized)*:

evidence, fruits, and instrumentalities of a crime, as more fully described in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2314 | interstate transportation of stolen property; and |
| 18 U.S.C. § 2315 | receipt of stolen property having crossed state lines. |

The application is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jeffrey Cady, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____11/08/2012_____

_____
*Judge's signature*

City and state:  Providence, Rhode Island

Lincoln D. Almond, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
FOR RHODE ISLAND

IN THE MATTER OF THE SEARCH OF:
**13, 25, and 31 Conduit Street**
**Central Falls, Rhode Island**

Case No. _1:12 MJ336 A_

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Jeffrey Cady, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 13, 25, and 31

Conduit Street, in Central Falls, Rhode Island, hereinafter "PREMISES," further described in

Attachment A, for the things described in Attachment B.

2.       I am a Special Agent with the Federal Bureau of Investigation (FBI), and have

been for the last seventeen years.  I have participated in numerous organized crime related

investigations involving a variety of federal criminal offenses including violations of the Hobbs

Act, (extortion affecting interstate commerce), 18 U.S.C. §1951 Racketeer Influenced Corrupt

Organizations (RICO) and conspiracy to violate RICO, 18 U.S.C. § 1962 (c ), (d) criminal

gambling, 18 U.S.C. §§ 1084,  § 1511 and violations of federal usury laws 18 U.S.C. § 892.

3. My investigations have entailed, among other things, conducting or participating in physical surveillances, the execution of search warrants, debriefings of informants and reviews of taped conversations and the use of court authorized electronic intercepts.

4. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation; from discussions with other agents of the FBI and other law enforcement; from my discussions with witnesses involved in the investigation; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another FBI agent, law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Facts not set forth herein are not being relied on in reaching my conclusion that the requested warrant should be issued. Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

5. As set forth below, there is probable cause to believe that the PREMISES contain evidence, instrumentalities, and fruits of violations of federal law, as further set forth in Attachment A to this Affidavit, including, but not limited to interstate transportation of stolen property and the receipt of stolen property having crossed state lines, in violation of 18 U.S.C. §§ 2314 and 2315, respectively (TARGET OFFENSES).

## PROBABLE CAUSE

6.     This application is submitted in connection with an investigation into Andrew

JEREMIAH, Bruce JEREMIAH, Anthony SIMONE, SR., and Earle TAMMELLO's

participation in the TARGET OFFENSES.

7.     On March 23, 2011, the Providence Police Department received a complaint from

Lee ALLEN, Manager, Burger King Restaurant, 60 Hartford Avenue, Providence, RI, reporting

the theft of approximately $500.00 worth of used cooking oil from his establishment.  ALLEN

stated that he was notified to check the grease bin behind his establishment due to an increase of

thefts of oil from other Burger King Restaurant locations.  He did so and discovered that oil had

been stolen.

8.     On March 30, 2011, Ronald REGO, Manager, Burger King Restaurant, 280 Broad

Street, Providence, RI, contacted the Providence Police Department to report a larceny of used

cooking oil from his establishment and the Burger King Restaurant located at 155 Thurbers

Avenue, Providence, RI.  REGO stated that he attempted to confront the subject responsible for

these thefts and he was ultimately struck by the subject's vehicle as the subject attempted to flee

the Thurbers Avenue location with the stolen oil.

9.     On April 5, 2011, Ronald REGO, Manager, Burger King Restaurant, 280 Broad

Street, Providence, RI, appeared at the Providence Police Department to review a photographic

line-up of the potential subject involved in the reported theft of used cooking oil previously

reported to the police.  Thereafter, REGO positively identified Mark LACEY, D.O.B. ███████,

as the same individual that he observed stealing the used cooking oil from the Burger King

Restaurant located at 155 Thurbers Avenue, Providence, RI, and 280 Broad Street, Providence, RI. REGO also positively identified LACEY as the individual that struck REGO with his vehicle while attempting to flee the restaurant at 155 Thurbers Avenue, Providence, RI. Based upon the aforementioned identification, the Providence Police Department sought and received a state arrest warrant for LACEY for felony larceny and Assault with a Deadly Weapon. That warrant was issued on April 17, 2011.

10.     On June 21, 2011, Mark LACEY, D.O.B. ▮▮▮▮▮▮, was arrested at his residence at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, by members of the Providence Police Department. LACEY was provided with a copy of a Miranda Rights form which he read and acknowledged understanding by signing. Thereafter, LACEY willingly agreed to speak and provided a statement to investigators regarding these pending criminal charges. LACEY advised that he was fully aware that the used cooking oil he was taking was a violation of law. LACEY claimed that he was operating under the direction and employ of Bruce and Andrew JEREMIAH. LACEY stated that Bruce JEREMIAH had shown him where to siphon the used cooking oil from and would provide LACEY with a "list" of locations where LACEY was directed to steal used cooking oil. LACEY advised that he was required to turn in this "list" after completing this task. Furthermore, LACEY stated that the JEREMIAHS directed him to perform these thefts during the hours of 2 a.m. and 6 a.m. LACEY indicated that the vehicle he was operating when performing these thefts was registered to JEREMIAH MOTOR CORP. and bore Rhode Island Commercial Registration "52458" ("tanker truck") LACEY advised that he was supposed to be paid three hundred dollars for every tank load of grease stolen (which your affiant has taken to mean tanker truck load).

4

11.     On August 28, 2012, a check of NCIC and Rhode Island Registry of Motor Vehicle records regarding Rhode Island Commercial License Plate "52458" revealed that the tanker truck, a 1984 Ford Color white bearing VIN#1FDNR74N3EVA15558, is registered to JEREMIAH MOTOR CORP., 35 Whitewood Drive, Cranston, Rhode Island. I have learned that JEREMIAH MOTOR CORP. is a company that law enforcement sources have linked to Bruce and Andrew JEREMIAH.

12.     Your affiant has made inquiry of the Rhode Island Judicial Information Records System and have learned that Andrew JEREMIAH has previously been convicted of criminal offenses including conspiracy to violate the Rhode Island Uniform Controlled Substances Act (1998), Perjury (1998), Felony Assault and Breaking and Entering (1986), Providing a False Document to a Public Official (1982). Your affiant also made inquiry of Bruce JEREMIAH and learned he has been convicted of criminal offenses including Conspiracy to Violate the Rhode Island Uniform Controlled Substances Act (1998) and Operating after his driver's license had been suspended (2008). Your affiant also made inquiry of Anthony C. SIMONE and have learned that SIMONE has a criminal record including convictions for Possession of Cocaine (1992), Possession of marijuana with intent to deliver (1994), assault (1998) and obtaining money under false pretenses (2000). Your affiant made inquiry of FBI criminal history databases and have learned that Earl TAMMELLEO has been convicted in the State of Florida of felony larceny (1990), and in the State of Rhode Island for Receiving stolen goods (1976), Breaking and entering (1977), assault on a police officer (1978), loitering for prostitution (1980), assault with a dangerous weapon (1987), assault on a police officer (1988), possession of cocaine (1990), felony larceny (1995), assault (1999), and possession of a controlled substance (2010).

13.     On July 10, 2012, Sergeant Jason King, of the Mattapoisett Police Department, observed a vehicle in the rear of Nick's Pizza in Mattapoisett, MA.  A short time later Sgt. King observed the vehicle travel on County Road in Mattapoisett, MA which then made an illegal U-turn.  The vehicle bore Rhode Island Commercial license plate 52458.  Sgt. King eventually stopped the truck and determined that the operator, Anthony SIMONE (DOB: ███████), who identified himself with his Rhode Island driver's license # ██████, had an active warrant from Quincy, MA for failing to pay fines (shoplifting).  SIMONE was arrested, advised of his Miranda Rights, and placed into the rear of a Mattapoisett Police cruiser.  SIMONE was asked what he was doing behind Nick's Pizza and SIMONE replied that he was checking for cooking oil. Thereafter, the Mattapoisett Police Department checked the area behind Nick's Pizza where this vehicle was observed and located what appeared to be "fresh" "wet "cooking oil spilled on the ground.  It was also determined that the container utilized by Nick's Pizza to store their used cooking oil was empty.  The vehicle that SIMONE was operating was towed by Murphy's Towing to their garage for storage.

14.     On August 31, 2012, your affiant spoke with Robert MURPHY of MURPHY TOWING and AUTO SALVAGE, 35 County Road, W. Wareham, MA, telephone number (508) 295-8697.  MURPHY advised that on July 10, 2012, MURPHY and his brother towed a large white Ford F700 truck, utilized in the collection of used cooking grease, at the request of the Mattapoisett Police Department.  MURPHY stated this vehicle was towed back to his shop and stored due to an arrest of the vehicles operator.  Later that same day, MURPHY stated that two males came to his shop in West Wareham to retrieve the vehicle.  One male was described as being in his late 60's, 5'10" to 6'0", heavier set.  The other male was described as being between

6

the ages of 45-50 with a thinner build. MURPHY advised that this younger male drove the truck off of his property once the tow fees were paid. Additionally, MURPHY stated that the older gentlemen produced a Rhode Island driver's license # ████ identifying himself as Andrew JEREMIAH, ████████████. MURPHY claimed that JEREMIAH paid the tow fees with cash and advised that the vehicle was used to collect used cooking oil from restaurants. MURPHY stated that originally his office did not know what name to put on the tow slip and deliberately left it blank until JEREMIAH showed up and produced his Rhode Island License.

15.     On August 31, 2012, a check of Rhode Island Registry of Motor Vehicles records revealed that Rhode Island Driver's License number # ████ is assigned to Andrew JEREMIAH, 21 Lawn Acre Drive, Cranston, RI, DOB: ████. Height: 5'09", Weight:210, Eyes: Brown, SSN: ████ on an active license that is also valid for a motorcycle.

16.     On August 29, 2012, your affiant spoke with David BENOIT, a Private Investigator, who was hired by both Baker Commodities Inc. and Western Massachusetts Rendering Company (WMRC) to investigate recent thefts of used cooking oil from their respective companies. I have determined that BENOIT, who is a retired Massachusetts State Police Sergeant, has extensive criminal investigative experience. Prior to contacting the FBI and the Central Falls Police Department, BENOIT initiated an investigation, to include the use of physical surveillances, surrounding recent complaints of theft of used cooking oil from both Baker Commodities and WMRC.

17.    BENOIT advised that on August 15, 2012, a WMRC employee reported that he was attempting to perform a routine pick-up of used cooking oil from Cheng Du Restaurant, Westboro, MA., Upon arrival, this WMRC employee observed a large white truck bearing Rhode Island Commercial License plate "52458," with a large plastic container on the bed, parked alongside of the WMRC used oil container used by the restaurant. After further inspection, the WMRC employee observed an older white male in his mid to late 50's, 5'10", thin to medium build, wearing a hat and in the process of siphoning off the used cooking oil from the WMRC container. After seeing the WMRC employee, this individual immediately removed the siphon hose from the WMRC container and drove off in the above referenced vehicle. It was later determined that the WMRC container, which can hold approximately 294 gallons of used cooking oil, was approximately half full.

18.    BENOIT advised that also on August 15, 2012, a Baker Commodities employee observed the tanker truck bearing Rhode Island Commercial registration "52458", parked alongside of the warehouse at the PREMISES. This employee observed some men pumping the truck's contents into the warehouse via a hose that ran through a hole in the wall of the PREMISES.

19.    BENOIT advised that on August 16, 2012, a Baker Commodities employee observed the aforementioned truck bearing Rhode Island Commercial tag "52458", parked inside of the garage located at the PREMISES. An individual, described as a blond male in his 50's, was observed driving the tanker truck and a green Chevrolet Blazer bearing Rhode Island tag "652993". This individual was observed departing the area behind the wheel of the tanker truck and was followed by an individual believed to be Bruce JEREMIAH. Bruce JEREMIAH, who

8

was following the above tanker truck, was observed operating a Mercedes Benz bearing Rhode Island tag "9359".

20.     On September 4, 2012, a check of NCIC and Rhode Island Registry of Motor Vehicles revealed the following information for the following Rhode Island license plates:

    a.  Rhode Island passenger tag "9359" is registered to a 1993 Mercedes Benz, gold in color, registered to JEREMIAH MOTOR CORP., 35 Whitewood Drive, Cranston, RI.

    b.  Rhode Island passenger tag "652993" is registered to a 1995 Chevrolet Blazer, green in color, registered to Earle TAMMELLO, D.O.B.: ██████, ██████ ██████.

21.     BENOIT advised that on August 16, 2012, a Baker Commodities employee observed a Ryder Truck, bearing Massachusetts commercial plate "P26914", being pulled into the smaller garage bay located at the PREMISES.  This employee also observed this truck being loaded with large containers.  Thereafter, this rental truck was observed leaving the garage and eventually followed to Mr. Messenger Trucking, Sharp Drive, Cranston, RI, where the containers that were previously loaded into the rental vehicle in Central Falls were off-loaded and prepared for transport by Mr. Messenger.

22.     BENOIT advised that on August 21, 2012, he observed Bruce JEREMIAH, who was operating the Mercedes Benz bearing Rhode Island tag "9359" arrive at the warehouse located at the PREMISES.  The vehicle believed to be operated by TAMMELLEO was also observed at this location.  Thereafter, BENOIT observed the tanker truck, bearing Rhode Island

Commercial tag "52458" leave the garage of the PREMISES and pull alongside of the building. The contents of the tanker truck were then pumped into the warehouse via a hose attached to the tanker truck that ran through a hole in the wall of the PREMISES.

23.     BENOIT advised that on August 22, 2012, he conducted surveillance in the vicinity of the warehouse located at the PREMISES.  While conducting this surveillance, BENOIT observed Bruce JERMIAH and TAMMELLEO arrive at the aforementioned location. During the course of this surveillance, BENOIT observed a Ryder Rental truck bearing Massachusetts Commercial tag "P26914" arrive at the above location and was eventually pulled into the smaller garage.  Thereafter, the tanker truck bearing Rhode Island Commercial tag "52458" was pulled out of the garage and alongside of the PREMISES where its contents were again pumped into the warehouse by a hose attached to the vehicle through a small hole located in the warehouse wall.  The Ryder Rental truck was eventually followed to Mr. Messenger, Sharp Drive, Cranston, RI.

24.     On August 23, 2012 at approximately 1:15 a.m., BENOIT established a physical surveillance in the vicinity of the PREMISES.  BENOIT observed SIMONE, who was operating a blue Mercury Marquis bearing Florida Tag "L274ZN," arrive and park outside of the aforementioned warehouse.  BENOIT observed SIMONE enter the tanker truck bearing Rhode Island Commercial tag "52458" and depart the area.  Thereafter, BENOIT observed SIMONE drive to the rear of the following closed businesses where he remained for a period of time:

    a.  Brother's Pizza, Rt 138, Raynham Plaza, Raynham, MA

    b.  The Rt. 138 Thai Chinese Restaurant, Raynham, MA

   c.  The Market Basket Super Market, Rt. 138 Raynham, MA

   d.  Dave's Diner, Rt. 28, Middleboro, MA

   e.  Harry's Bar and Grill, Rt. 28 Middleboro, MA

   f.  The China Sails Restaurant, Rt. 105 Middleboro, MA

   g.  Royal Pizza, Rt. 105 Lakeville, MA

25.    At approximately 4:00 a.m., BENOIT observed SIMONE, who was operating the tanker truck, return to the warehouse located at the PREMISES, followed by Bruce JEREMIAH who was operating his Mercedes Benz bearing Rhode Island tag "9359". BENOIT advised that he contacted the Central Falls Police Department (CFPD) regarding his recent observations. Shortly thereafter, members of the CFPD arrived at the Conduit Street address and using a ruse, approached and identified the operator of the tanker truck as Anthony SIMONE, D.O.B.: ████████, RI License number #████████, ████████████████████. The CFPD also identified the operator of the Mercedes Benz as Bruce JEREMIAH, D.O.B.: ████████, RI License number #████████, ████████████████.

26.    On August 23, 2012, BENOIT determined that the used cooking oil had been stolen from all of the businesses listed above resulting in a financial loss to not only the business owners but also the oil collection companies who have contracts with these locations. Your affiant has reason to believe that the aggregate value of the cooking oil being stolen is in excess of $5000, based on my conversations with and documents provided by private investigator Benoit.

11

27.    On August 24, 2012, the Stoneham Police Department, Stoneham, MA, received a complaint from ANGELO I. CARUSO, Owner, Angelo's Pizzeria, 239 Main Street, Stoneham, MA, reporting the theft of over $200.00 worth of used cooking oil from his establishment. CARUSO stated that he checked his video surveillance equipment at the restaurant and observed a large truck with a large container attached, which is designed to remove liquids, pull into the rear portion of his restaurant on August 24, 2012 at approximately 3:24 a.m. CARUSO advised that the operator of this vehicle appeared to back the truck up to a large plastic container, which is utilized by CARUSO to store used cooking oil, and siphon off its contents. CARUSO stores this plastic oil container within the confines of a fence in the rear of his restaurant. CARUSO stated that LIFECYCLE RENEWABLES, who compensates him for this used oil, was contacted and indicated that they did not make a pick-up at his location on the above date. Your affiant has not yet received a copy of the aforementioned surveillance video but did review still photographs of the vehicle and its operator. Based upon the markings on the truck as well as the configuration of the two tanks the truck is carrying it appears that the vehicle responsible for the Stoneham theft is the tanker truck. Additionally, based upon a review of the grainy photographs it is believed that the tanker truck was being operated by SIMONE.

28.    On September 14, 2012 at approximately 8:11 a.m., a physical surveillance was established in the vicinity of the PREMISES. The tanker truck was observed pulled alongside of the building where it appeared that its contents were being pumped into the warehouse via a hose attached to the vehicle that ran through a hole in the wall of the PREMISES. Bruce JEREMIAH's vehicle, bearing Rhode Island tag "9359," was also observed parked outside of the warehouse during this off-loading process. The vehicle believed to be operated by

12

TAMMELLEO was also observed parked outside the warehouse at this time. Once the contents of the tanker truck were off-loaded, the tanker truck was eventually pulled alongside of the building where it was parked and the hood was raised. A short time later, the tanker truck was driven to the vicinity of a truck repair shop located at 11 Roddy Drive, Attleboro, MA, where it was dropped off for possible repairs.

29.   On September 17, 2012 at approximately 9:37 a.m., physical surveillance was established in the vicinity of the PREMISES. The tanker truck was observed alongside of the building while its contents appeared to be pumped into the warehouse via a hose attached to the vehicle that ran through a small hole located in the wall of the PREMISES. Bruce JEREMIAH's vehicle bearing Rhode Island tag "9359" and Andrew JEREMIAH's vehicle bearing Rhode Island tag "AAJ" were observed parked outside of the warehouse while the tanker truck was being off-loaded. The vehicle believed to be operated by TAMMELLEO was also observed parked outside the warehouse at this time. Once the contents of the tanker truck were off-loaded, the vehicle was moved to the rear the PREMISES. A short time later, the tanker truck left the rear of the building and was observed traveling on Conduit Street towards Lonsdale Avenue. The tanker truck was never observed exiting onto Lonsdale Avenue and it was assumed that the vehicle was placed into a garage bay located on the side of the warehouse at the PREMISES where it has been observed in the past.

30.   On September 17, 2012 at approximately 6:18 p.m., a physical surveillance was established in the vicinity of the PREMISES. A tractor trailer bearing Rhode Island tag "30935" was observed backed into one of the garage bays of the warehouse. The tanker truck was observed parked and unoccupied in the other garage bay of the warehouse. Initially, the

warehouse garage bays were occupied by two unknown white males. One unknown male appeared to be operating a fork lift and was loading some objects into the back of the previously mentioned tractor trailer. The second unknown male eventually departed the area in a maroon Chevrolet Blazer bearing Rhode Island tag "754125".

31.     On September 17, 2012, a check of NCIC and the Rhode Island Registry of Motor Vehicles revealed the following information for the following Rhode Island license plates:

a.  Rhode Island tractor trailer plate "30935" came back on a 2005 HMT, silver in color, registered to Renato A. FREITAS, D.O.B.: ███████, ███████████ Cranston, RI.

b.  Rhode Island passenger plate "754125" came back on a 2003 Chevrolet, red in color, registered to Kristine M. PELTIER, D.O.B.: ███████, ███████████ █████████

32.     On September 20, 2012, early in the morning, your affiant and others established physical surveillance in the vicinity of the PREMISES. Your affiant observed the tanker truck bearing Rhode Island Commercial tag "52458" depart the area. Thereafter, your affiant observed the truck drive to the following closed businesses, where it remained for a period of time, before returning to the PREMISES and pulling into the small garage bay:

a.  The Chateau Restaurant, 404 Providence Hwy, Norwood, MA;

b.  Friendly's, 1469 Providence Hwy, Norwood, MA;

c.  Stop and Shop Supermarket, 1415 Boston-Providence Hwy, Norwood, MA;

14

    d.  Chipotle Mexican Grill, 1415 Boston-Providence Hwy, Norwood, MA;

    e.  Taco Bell, 90 Providence Hwy, Walpole, MA;

    f.  Chili's Restaurant, 120 Providence Hwy, Walpole, MA;

    g.  Clyde's Grill and Bar, 642 Providence Hwy, Walpole, MA;

    h.  Big Y Supermarket, 999 Providence Hwy, Walpole, MA; and

    i.  Asia Treasures Restaurant, 399 High Plain St. Walpole, MA.

    j.  Chili's Restaurant, 930 Providence Hwy, Dedham, MA;

    k.  Kiku Yama Teppanyaki Steak House, 350 Washington, St., Dedham, MA;

    l.  The 50's Diner, 47 Legacy Blvd. Dedham, MA; and

    m.  Joe's American Bar and Grill, 985 Providence Hwy Dedham, MA.

33.    On September 20, 2012, your affiant spoke with Elmer UMANZOR of the Chateau Restaurant, 404 Providence Hwy, Norwood, MA.  UMANZOR advised that his restaurant usually dumps over 75 gallons of cooking oil each week into a storage container located on a raised platform alongside the business.  The oil is regularly collected by Baker Commodities.  UMANZOUR and your affiant inspected the tank and determined that it was 1/4 full and contained only coagulated oil.

34.    On September 20, 2012, your affiant spoke with Ronald DOOLITTLE, Manager of Friendly's, 1469 Providence Hwy, Norwood, MA.  DOOLITTLE advised that the restaurant dumps used cooking oil into a storage container outside the business each week.  He and your

affiant inspected the container and it appeared to be virtually empty, containing only a small amount of oil coagulated on the bottom. DOOLITTLE advised that based on the grease residue visible on the inside of the container, the container should be half full. On September 21, 2012, your affiant spoke with Marcia ADWIN, General Manager of Friendly's, 1469 Providence Hwy, Norwood, MA. ADWIN advised that Baker Commodities regularly picks up their oil. She advised that she called Baker Commodities, who reported that they had not collected oil from her restaurant since July 23, 2012. ADWIN further advised that the container was half full of grease when she checked it the week before and that she was absolutely certain someone had stolen cooking oil from the container.

35.     On September 20, 2012, your affiant spoke with Winslow WHITTIER of Stop and Shop Supermarket, 1415 Boston-Providence Hwy, Norwood, MA. WHITTIER advised that the store dumps used cooking oil each night into a storage tank located to the rear of the business. He advised that the container should hold the oil accumulated since Baker Commodities last picked up the oil. WHITTIER and your affiant inspected the container and determined that it was virtually empty, containing only a small amount of oil coagulated on the bottom.

36.     On September 20, 2012, your affiant spoke with Corey ROUTH of Chipotle Mexican Grill, 1415 Boston-Providence Hwy, Norwood, MA. ROUTH advised that the restaurant dumps used cooking oil into a storage container located in a fenced in area behind the business. ROUTH advised that the container should be more than half full. However, when ROUTH and your affiant inspected the container, it appeared to contain only oil that had been dumped by the restaurant that morning.

37.     On September 20, 2012, your affiant spoke with Lisa HEBERT of Taco Bell, 90 Providence Hwy, Walpole, MA. HEBERT advised that the restaurant dumps used cooking oil into a storage container located in a fenced in area behind the business. HEBERT advised that the container is regularly emptied by Big Green Hippo, but should contain whatever oil has been dumped since the last pick-up. However, when she and your affiant, inspected the container, it appeared to be empty.

38.     On September 20, 2012, your affiant spoke with Casey BOURRET of Chili's Restaurant, 120 Providence Hwy, Walpole, MA. BOURRET advised that the restaurant dumps used cooking oil into a storage container located in a fenced in area behind the business. BOURRET advised that the container is regularly emptied by Baker Commodities, but should contain at least 150-170 gallons of oil or whatever oil that had been dumped since the last pick-up. However, when BOURRET and your affiant inspected the container, it appeared to contain only a small amount of coagulated oil.

39.     On September 20, 2012, your affiant spoke with Stacey WHITE of Clyde's Grill and Bar, 642 Providence Hwy, Walpole, MA. WHITE advised that the restaurant dumps used cooking oil into a storage container located behind the business. The container is regularly emptied by Cape Cod Biofuels. WHITE advised that 26 gallons of oil had been dumped on September 15, 2012, and that the container should contain any oil that had been dumped since it was last emptied. WHITE and your affiant inspected the container and determined that it was virtually empty with only a very small amount of oil coagulated at the bottom. WHITE further advised that, last year, she had approached an unknown male illegally siphoning off oil from the tank, but did not report the incident.

17

40.     On September 20, 2012, your affiant spoke with Michael HANRAHAN of Big Y Supermarket, 999 Providence Hwy, Walpole, MA.  HANRAHAN advised that the store dumps used cooking oil each into a storage container located outside the business.  He further advised that the container is regularly emptied by Western Massachusetts Rendering Company, but should contain whatever oil has been dumped since the last pick-up.  However, HANRAHAN and your affiant inspected the container and it was empty.

41.     On September 20, 2012, your affiant spoke with Wendy LIN of Asia Treasures Restaurant, 399 High Plain Rd. Walpole, MA.  LIN advised that the store dumps approximately 4 gallons of used cooking oil each week into a storage container located outside the business.  She advised that oil was last dumped on September 17, 2012.  She further advised that the oil is regularly collected by Baker Commodities and the container should contain whatever oil has been dumped since the last pickup.  However, when LIN and your affiant inspected the container, it was empty.

42.     On September 20, 2012, your affiant spoke with Jennifer GRIECO of Chili's Restaurant, 930 Providence Hwy, Dedham, MA.  GRIECO advised that her restaurant usually dumps used cooking oil on a nightly basis into a storage container located within a fenced in area behind the business.  The oil is regularly collected by Baker Commodities.  She advised that the amount of oil remaining in the container on September 20, 2012, was considerably less than that on September 17, 2012, and contained only coagulated oil, leading her to believe the oil was stolen.

43.    On September 20, 2012, your affiant spoke with Ricky Lee of Kiku Yama Teppanyaki Steak House, 350 Washington, St., Dedham, MA.  LEE advised that his restaurant usually dumps used cooking oil into a storage container in the rear of his business.  The oil is regularly collected by Baker Commodities.  LEE advised that the he was unsure how much oil should be in the container, but at minimum, it should contain whatever oil had accumulated since the last pickup.  LEE and your affiant inspected the container, finding that it was 1/5 full and only contained coagulated oil.

44.    On September 20, 2012, your affiant spoke with Speto DEAMANTOPOULOS of The 50's Diner, 47 Legacy Blvd. Dedham, MA.  DEAMANTOPOULOS advised that his restaurant usually dumps used cooking oil into a storage container in a fenced-in area in rear of his business.  He advised that he must call Baker Commodities to come pick up the oil. DEAMANTOPOULOS advised that prior to September 20, 2012, the container was almost full and he had intended to schedule a pick-up soon.  However, on September 20, 2012, the container appeared to be nearly empty, containing only a small amount of coagulated oil.

45.    On September 20, 2012, your affiant spoke with John O'HEARN of Joe's American Bar and Grill, 985 Providence Hwy Dedham, MA.  O'HEARN advised that his restaurant usually dumps used cooking oil into a storage container kept in a fenced in area to the rear of his business.  The oil is regularly collected by Baker Commodities.  O'HEARN advised that the container should, at minimum, contain whatever oil had accumulated since the last pickup.  However, on September 20, 2012, the container appeared to be virtually empty with only a small amount of coagulated oil remaining at the bottom.

46. On October 12, 2012, early in the morning, your affiant and others established physical surveillance in the vicinity of the PREMISES. Your affiant observed the tanker truck bearing Rhode Island Commercial tag "52458" depart the area. Thereafter, your affiant observed that truck drive to the following closed businesses:

a. Olive Garden Italian Restaurant, 1240 Newport Ave., South Attleboro, MA;

b. Shanghai Gardens Restaurant, 901 Washington St., South Attleboro, MA;

c. Mediterranean Grill and Pizzeria, 595 Washington St., South Attleboro, MA;

d. Burger King, 520 Washington St., South Attleboro, MA;

e. Papa Gino's, 283 Washington St., South Attleboro, MA;

f. Ruby Tuesday, 287 Washington St., South Attleboro, MA;

g. Longhorn Steakhouse, 1250 South Washington St., North Attleboro, MA;

h. Stop and Shop, 206 E. Washington St., North Attleboro, MA;

i. La Strada Pizza and Subs, 245 E. Washington St., North Attleboro, MA;

j. Yen Ching II, 445 E. Washington St., North Attleboro, MA;

k. Norm's Seafood, 465 E. Washington St., North Attleboro, MA;

l. Box Seats, 500 E. Washington St., North Attleboro, MA;

m. Rancho Chico, 52 Washington St., Plainville, MA; and

n. Papa Gino's, 211 North St., Foxboro, MA.

At each location, the driver appeared to siphon off or attempt to siphon off used cooking oil from grease containers, before returning to the PREMISES and pulling the truck into the small garage bay. Later that day, your affiant and others inspected the grease containers at each location and found them virtually empty, containing only coagulated oil.

47.     On October 12, 2012, your affiant spoke with Raymond MUI of Shanghai Gardens Restaurant, 901 Washington St., South Attleboro, MA. MUI advised that the restaurant usually dumps used cooking oil into two storage containers at the rear of the business. The oil is regularly collected by Cape Cod Bio Fuels. MUI stated that he receives a receipt from Cape Cod Bio Fuels after each pickup. However, he did not recall receiving a receipt in months. As stated above, when your affiant and MUI inspected the containers on October 12, 2012, they were virtually empty.

48.     On October 12, 2012, your affiant spoke with Robert CAREY of Ruby Tuesday, 283 Washington St., South Attleboro, MA. CAREY advised that the restaurant usually dumps 20 to 25 gallons of used cooking oil per week into a storage container at the rear of the business. The oil is regularly collected by Baker Commodities. CAREY stated that he had been contacted by Baker Commodities and informed that Baker had not collected any oil from his business in 6 months. CAREY advised that he had checked the container a few days ago and found it approximately three-quarters full. As stated above, when your affiant and CAREY inspected it on October 12, 2012, the container was virtually empty.

49.     On October 12, 2012, your affiant spoke with Bret HUDICK of Longhorn Steakhouse, 1250 South Washington St., North Attleboro, MA. HUDICK advised that the restaurant usually dumps 30 to 35 gallons of used cooking oil per week into a storage container at the rear of the business. The oil is regularly collected by Baker Commodities. HUDICK stated that he had checked the container a few days prior and found it to be almost full. However, as stated above, when your affiant and HUDICK inspected it on October 12, 2012, the container was virtually empty.

50.     On October 12, 2012, Liane JODOM of Norm's Seafood, 465 E. Washington St., North Attleboro, MA advised that the restaurant dumps used cooking oil into a storage container located within a locked, fenced in area at the rear of the business. The oil is regularly collected by Western Massachusetts Rendering. JODOM stated that on October 11, 2012, the container was full of used oil and the lock on the fence was in place. However, when the area was inspected on October 12, 2012, the lock and hasp had been cut and, as stated above, the container was empty.

51.     On October 12, 2012, Jan IBRAHIM of La Strada Pizza and Subs, 245 E. Washington St., North Attleboro, MA advised that the restaurant dumps used cooking oil into a storage container. The oil is regularly collected by Envirotek. IBRAHIM advised that the container had been full as recently as a few days prior. However, as stated above, when the container was inspected on October 12, it was virtually empty.

52.     On October 22, 2012, your affiant observed an 18 wheeled tractor-trailer tanker truck at the PREMESIS. The trailer bore Maine license plate 1378394. It appeared that used

22

cooking oil was being pumped out of the building into the tank of the trailer via a hose run through a small hole located in the wall of the PREMISES. Once this process was complete, the hose was pushed back through the hole into the PREMISES. The truck was then driven to a scrapyard at 136 Bacon Street, Attleboro, MA where it was observed entering a truck scale and appeared to be weighed. The markings on this tanker truck indicate that it is owned by Abenaqui Carriers, which, according to their website, specializes in the transport of fuels, including biofuels

53.　　On October 26, 2012, at approximately 6:53 a.m., Anthony SIMONE called Bruce JEREMIAH at ▮▮▮▮▮▮. During the conversation, JEREMIAH inquired into the condition of the tanker truck and how much oil SIMONE had collected that morning. SIMONE responded that he had collected "probably over 1000" gallons of oil earlier that morning. Prior to the call, SIMONE left the tanker truck containing the oil in the small garage at the PREMESIS.

54.　　On October 26, 2012, Andrew JEREMIAH met with Anthony SIMONE at his residence, located at ▮▮▮▮▮▮▮▮▮▮. During their meeting, they discussed outfitting Andrew JEREMIAH's Dodge pickup truck with an oil tank, camper cap, and a quiet pump. JEREMIAH indicated that he wanted to hide the tank and pump and camouflage it to look like a camper truck and wanted it to be "mysterious." JEREMIAH showed Anthony SIMONE a brochure with pictures of camper caps for pickup trucks.

55.　　On November 2, 2012, at approximately 6:53 a.m., Anthony SIMONE called Bruce JEREMIAH at ▮▮▮▮▮▮. During the conversation, JEREMIAH inquired into the

23

condition of the tanker truck and how much oil SIMONE had collected that morning. SIMONE

responded that he had collected "about 800" gallons of oil earlier that morning. SIMONE

informed JEREMIAH that he had collected the oil from Massachusetts. Prior to the call,

SIMONE left the tanker truck containing the oil in the small garage at the PREMESIS.

    56.    On November 2, 2012, at approximately 7:35 a.m., Andrew JEREMIAH met with

Anthony SIMONE at his residence, located at ███████████████████████.

During the meeting, JEREMIAH indicated that the conspiracy had been going on for at least two

years. JEREMIAH and SIMONE discussed how JEREMIAH had instructed SIMONE to steal

oil from Worcester, Massachusetts. JEREMIAH instructed SIMONE to now also steal oil from

Mystic, Connecticut so as to "spread it out" and lessen the likelihood of being caught.

JEREMIAH reviewed the basic nature of the conspiracy when he reiterated the various roles of

the players by stating that SIMONE collects the oil, Bruce JEREMIAH filters it, and he (Andrew

JEREMIAH) is the brains and "sells every drop we get." JEREMIAH also indicated that he had

taken several steps towards camouflaging his Dodge pickup truck so he can "rob things . . . right

in the [expletive] daytime," including attempting to outfit it with a low profile oil tank, a quiet

pump with an custom muffler, and a camper cap. JEREMIAH also paid SIMONE $300 in cash

during the meeting.

    57.    On November 7, 2012, Anthony SIMONE retrieved an envelope from a mailbox

at 35 Whitewood Drive in Cranston, Rhode Island. The envelope contained $321 in cash – $300

in payment for oil SIMONE had collected that morning and $21 in reimbursement for gloves

purchased by SIMONE. SIMONE has indicated that this is generally how he receives his

payment. I have examined the envelope in which SIMONE'S cash payment was received. On

one side of the envelope is written the name "Anthony" and an address of 1090 Cranston Street

Hamilton Bld. Approved. Zoning certificate." On the opposite side of the envelope is written

"Town of Business Ficktish (sic) Name-Filing Business certific (sic)."

58.     I have learned from detectives from the Central Falls, Rhode Island Police

Department that during the summer of 2012, officials from the Central Falls Code Enforcement

Office attempted to inspect the PREMISES. During their inspection, they spoke to an individual

who identified himself only as "Bruce." Bruce indicated that he volunteers as the manager of the

business located at that address and that the business collects and refines vegetable oil. Bruce

also indicated that the business is owned by Andy JEREMIAH. During their inspection, officials

observed several large holding tanks, a piece of equipment described to the officials as a

vegetable oil generator, and, in the southwest corner of the PREMISES, an office that appeared

to the officials to be used by Bruce.

## TECHNICAL TERMS

59.     Based on my training and experience, I use the following technical term to convey

the following meanings:

   a.  Storage medium: A storage medium is any physical object upon which computer

       data can be recorded. Examples include hard disks, floppy disks, flash memory,

       CD-ROMs, and several other types of magnetic or optical media not listed here.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

60. As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. Because of the widespread and expected use of computers in any business environment, one form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

61. *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being

26

used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

e. As was set forth more fully above, an individual named "Bruce" believed to be Bruce JEREMIAH, has an office within the PREMISES. Based on the above described information your affiant has reason to believe and does in fact believe that the targets of this investigation are involved in the theft of used cooking oil and are transporting this stolen property across state lines where they thereafter sell the stolen oil to "legitimate" buyers of used cooking oil. It is reasonable to conclude that the targets would keep records, including invoices and journal

27

notations of the amount of oil sold and the price received for the oil sold from the
PREMISES. It is equally reasonable to conclude that in the unlikely event that
the JEREMIAHS have bona fide contracts or purchase agreements with producers
of used cooking oil, copies of such agreements would be kept and maintained
either in their "hard" paper form or electronically and would assist investigators in
isolating the percentage of cooking oil acquired unlawfully. Furthermore, as was
set forth more fully above, the JEREMIAHS appear to provide their driver with a
list of locations from which to steal the oil and bring it across state lines. It is
reasonable to conclude that copies of such lists and the source of them may be
stored in paper or electronic form.

62.    *Forensic evidence.* As further described in Attachment B, this application seeks
permission to locate not only computer files that might serve as direct evidence of the crimes
described on the warrant, but also for forensic electronic evidence that establishes how
computers were used, the purpose of their use, who used them, and when. There is probable
cause to believe that this forensic electronic evidence will be on any computer in the PREMISES
because:

a.    Data on the storage medium can provide evidence of a file that was once on the
storage medium but has since been deleted or edited, or of a deleted portion of a
file (such as a paragraph that has been deleted from a word processing file).
Virtual memory paging systems can leave traces of information on the storage
medium that show what tasks and processes were recently active. Web browsers,
e-mail programs, and chat programs store configuration information on the

28

storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in

29

advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

63. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

31

64. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

65. I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

66. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature

disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Jeffrey Cady
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on October 25, 2012.

LINCOLN D. ALMOND
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched is 13, 25, and 31 Conduit St., Central Falls, Rhode Island. The property consists of an industrial warehouse type building occupied by the JEREMIAHS and being used to commit the TARGET OFFENSES. According to Central Falls Code Inspection Office officials although 13, 25, and 31 Conduit appear to be different addresses, they are all the same building. The property is located at the northwest corner of the intersection of Conduit Street and Duchess Way in Central Falls, RI. The building has a glass door facing Conduit St. labeled "25" and large and small garage bay doors facing Conduit St. These garage bay doors are the doors through which your affiant has seen the tanker truck bearing Rhode Island Commercial License plate "52458" enter and park. The portion of the building with white siding contains Bruce's office and the entry port through which the cooking oil is pumped into the building.

The following is an aerial view of the property:



## ATTACHMENT B

1.       All items and records relating to violations 18 U.S.C. §§ 2314 (interstate transportation of stolen property) and 2315 (receipt of stolen property having crossed state lines) and involving Andrew JEREMIAH, Bruce JEREMIAH, Anthony SIMONE, SR., Earle TAMMELLO, and Mark LACEY from January 1, 2011, to the present including:

    a.   lists of customers/buyers of the stolen oil along with related identifying information of these buyers including amounts paid, receipts and or journal entries documenting said payments;

    b.   equipment used to process, store, and transport the stolen oil, including vehicles, and any related records of such storage, processing, transportation or sale;

    c.   records reflecting prices paid by customers/ buyers of the stolen oil;

    d.   records reflecting the disposition and further transportation of the stolen oil, including shipping records, receipts for payments made;

    e.   correspondence related to the acquisition, transportation, sale, processing, or disposition of the oil;

    f.   records describing or listing locations where used cooking oil was or can be acquired/stolen from, including any customer lists or other proprietary information of data belonging to or originating from other organizations in the business of purchasing used cooking oil;

g.  lists of employees, agents or contractors for the JEREMIAHS or their used cooking oil business located on Conduit Street in Central Falls, RI;

h.  payroll records, including forms W-2, W-4 and 1099, and payment records for contract and consulting services for such business;

i.  all financial records, including:

    i.  ledgers,

    ii.  journals,

    iii.  bank records,

    iv.  checks,

    v.  check registers,

    vi.  credit card bills,

    vii.  wire transfer orders and confirmations,

    viii.  invoices,

    ix.  bills,

    x.  account information,

    xi.  promissory notes, agreements, and contracts,

xii.  statements of account for all checking, savings, money market, and brokerage accounts,

xiii.  financial statements for all accounts open in the name of Jeremiah Motor Corp., Andrew JEREMIAH, or Bruce JEREMIAH at any financial institution,

xiv.  deposit slips and receipts for all checking, savings, money market, and brokerage accounts; and

xv.  bookkeeper's and/or accountant work papers used in the preparation of financial statements, corporate tax returns or other corporate financial records.

j.  phone records;

k.  vehicle records, including insurance records, maintenance, and rental vehicle records; and

l.  records evidencing dominion or control of the premises or Jeremiah Motors Corp, including tax records.

2.  For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs,

3

registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.  evidence of the times the COMPUTER was used;

g.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).